IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION FILE NO.: |
| v. | |
| ERIC LETMAN, | 1:21-CR-067-TWT-JKL |
| Defendant. | |

## **FINAL REPORT AND RECOMMENDATION**

Defendant Eric Letman is charged in this case with three counts of bank robbery, one count of attempted bank robbery, and four associated firearms counts. [Doc 1.]  The case is presently before the Court on the following motions: (1) Mr. Letman's motion to suppress statements during a post-arrest custodial interview [Doc. 76], (2) his motion to suppress evidence seized following a traffic stop [Doc. 77], and (3) his motion to suppress searches of his car and residence pursuant to two state-issued search warrants [Doc. 90].

On August 3, 2023, I held an evidentiary hearing, at which Gwinnett County Police Department ("GCPD") Officer Thomas Fischer and FBI Special Agent Joshua Floyd testified.  [*See* Doc. 92 (hearing transcript or "Tr.").]  Afterward, the

parties filed post-hearing briefs.  [Docs. 94, 98, 101, 103, 107.]  For the reasons

that follow, it is **RECOMMENDED** that the motions be **DENIED**.

I.     **BACKGROUND**

    **A.     Bank Robberies in Gwinnett County, Georgia**

On August 26, 2020, a man armed with a handgun entered the Regions Bank

located in Dacula, Georgia.  [Doc. 90-1 at 3.]  He demanded money from a teller,

but when the teller did not comply, he left on foot.  [*Id.*]  The attempted robber was

described as an older black male, approximately 50 to 60 years old, who walked

with a limp.  [*Id.*]

The next day, on August 27, a man with a similar physical appearance—that

is, a 50-to-60-year-old black male who walked with a limp—held up a Bank OZK

in Grayson, Georgia.  [Doc. 90-1 at 3.]  This time, the robber fired one shot into

the wall behind the teller and made off with a sum of money.  [*Id.*]

Around two months later, on October 26, 2020, an armed black male wearing

a brown wig and a black tracksuit entered a PNC Bank in Lawrenceville, Georgia.

(Tr. at 6-7, GX 1.)[1]  He demanded the bank employees place money inside an

orange handbag and fired several shots.  (Tr. at 6; GX 1.)  Based on video footage

---

[1] The government's documentary exhibits can be found at Docs. 87-2
through 87-7.

2

of the robbery, GCPD issued a BOLO advising that the robber fled in a newer model Chrysler 300, possibly with a Texas license plate.  (Tr. at 7; GX 1.)  The BOLO included an image of the robber and two images of the Chrysler.  (Tr. at 7; GX 1.)

### B.      Mr. Letman's Arrest

On October 30, 2020, at around 8:25 a.m., a teller at the Regions Bank on Gravel Springs Road (the location of the attempted robbery on August 26) called 911 to report a suspicious car circling the bank.  (Tr. 12; GX 2.)  The teller identified the car as a Chrysler 300 with Georgia tag number PMG3215 and stated that it appeared to be the car involved in the August 26 attempted robbery of the bank.  (Tr. at 12.)  The teller also reported that the car was parked at a Kroger in the same shopping center, and that the occupant, a black male, was staring at the bank.  (Tr. 12; GX 2; *see* GX 3 (aerial image of strip center).)  After a couple of minutes, the teller advised that the car moved to the curb in front of a pediatrician's office.  (Tr. 13; GX 2.)

Officer Fischer responded to the call.  (Tr. 15, 19.)  He did not see the Chrysler in the Kroger parking lot; however, he noticed a black male—later identified as Mr. Letman—pumping gas into a black Chrysler 300 at an Exxon gas

3

station located in an outparcel in the same shopping center.[2]  (Tr. 15, 74; GX 3.)
The license plate on the Chrysler matched the description provided by the 911
caller.  (Tr. 19.)  According to Officer Fischer, the car had "chrome aftermarket
rims."  (Tr. 15, 45.[3])

Officer Fischer called for backup and parked his patrol car around 50 feet
behind the Chrysler.  (Tr. 20.)  Meanwhile, Mr. Letman finished pumping gas and
got into the car.  (Tr. 21.)  A short time later, Sgt. Silva[4] with the GCPD arrived at

---

[2] Mr. Letman writes in his brief that Officer Fischer first went to the Regions
Bank parking lot and encountered a security guard sitting in his car who reported
that he did not see anything suspicious.  [Doc. 101 at 4-5.]  This is inaccurate in
two ways.  First, bodycam footage shows that it was a different officer who
approached the security guard.  (DX 1, 54V-2.mp4 at 1:43-2:13 (showing an
unidentified officer speak with the security guard and then drive to the Exxon
station where Officer Fischer is seen speaking with Mr. Letman).)  Second,
contrary to Mr. Letman's assertion, the security guard did not say that he did not
see anything suspicious.  Rather, the bodycam footage shows the officer asking the
security guard if he had called 911, and the guard simply replying that he had not.
(DX 1, 54V-2.mp4 at 0:31-0:43.)

[3] As will be discussed further below, Mr. Letman argues that the wheels on
the Chrysler were not "aftermarket rims" but instead were among several styles of
wheels available from the manufacturer.  [Doc. 101 at 8.]  Mr. Letman also points
out that another officer on the scene said, "[t]hose wheels come standard on that
car," contradicting Officer Fischer's claim that the car had aftermarket rims.  (DX
1, 54V.mp4 at 1:19).  Whether the wheels were aftermarket or offered by the
manufacturer is not material, however, because the distinctive wheels of Mr.
Letman's Chrysler matched those of the car depicted on the BOLO.  (*Compare* GX
1, *with* DX 1, 54V.mp4 at 1:05.)

[4] Sgt. Silva's first name does not appear in the record.

4

the Exxon and parked his vehicle in front of the Chrysler.  (Tr. 20-21.)  Sgt. Silva approached the driver's side of the Chrysler and spoke with Mr. Letman.  (Tr. 21.) Officer Fischer approached on the passenger side, and when Mr. Letman lowered the window, Officer Fischer smelled marijuana.[5]  (Tr. 21-23.)  Mr. Letman did not have his driver's license.  (Tr. 24.)  After confirming that the license plate on the vehicle came was registered in Mr. Letman's wife's name, Officer Fischer asked Mr. Letman for his name and date of birth, which Mr. Letman provided.  (Tr. 24, 26.)  Using that information, Officer Fischer queried a law enforcement database, which revealed an active warrant for Mr. Letman's arrest for a probation violation in DeKalb County, Georgia.  (Tr. 26-27.)  It took around two minutes to confirm the warrant.  (*Id*.)

Sgt. Silva instructed Mr. Letman to exit the car, and Mr. Letman complied. (Tr. 57.)  As Mr. Letman was standing behind his car, Sgt. Silva said, "We're going to check on the warrant and if they don't want you, we're going to let you go."  (Tr. 58, DX 1 54V-4.mp4 at 6:09.)  Officer Fischer placed Mr. Letman in handcuffs, told him that he would be detained as the officers were "waiting on confirmation" from DeKalb County about the warrant, and explained that "if they tell me they

---

[5] Mr. Letman's suspected possession or use of marijuana was not a basis for detaining him.  (Tr. at 55.)

want you I'll take you.  If they say they don't want you right now, I'm going to let you go." (DX 1, 54V-6.mp4 at 7:33-7:42.)  Officer Fischer then placed Mr. Letman in the back of his patrol car.  (Tr. 39.)  A total of about 45 seconds passed between the time that Mr. Letman was handcuffed and placed into the patrol car.  (DX 1, 54V-6.mp4 at 7:15-8:30.)

At first, DeKalb County authorities advised GCPD that they did not want to take custody of Mr. Letman because of health concerns relating to the COVID-19 pandemic.  (Tr. 56; DX 1 54V-5.mp4 at 16:16.)  Officer Fischer then asked his supervisor if DeKalb authorities could be recontacted and asked to make an exception so the officers could continue to hold Mr. Letman and determine whether he had participated in the robberies.  (DX 1 54V-5.mp4 at 16:28.)  The supervisor agreed and requested that DeKalb be contacted again.  (DX 1 54V-5.mp4 at 17:48-18:30.)  Mr. Letman remained seated and handcuffed in the back of Officer Fischer's patrol car while GCPD communicated with DeKalb County.  (Tr. 59; DX 1, 54V-6.mp4 at 8:30-34:47.)  In the meantime, one of the responding officers inspected the Chrysler's license plate and found that the screws were "finger tight," meaning that a person could unscrew the bolts with his or her fingers.  (Tr. 24-25; *see also* DX 1 54V-4.mp4 at 10:06; DX 1 54V-6.mp4 at 11:03.)  Ultimately, DeKalb County advised that they would "take" Mr. Letman.  (Tr. 71.)

6

Officer Fischer returned to the patrol car and advised Mr. Letman that the warrant had been confirmed and that he would not be released.  (DX 1, 54V-6.mp4 at 8:30-34:47.)  In all, Mr. Letman sat in the back seat of the patrol car for around 26 minutes before being told that he would not be released.  (*Id.*)

### C.   Mr. Letman's Interrogation at Police Headquarters

Officer Fischer then transported Mr. Letman to the GCPD headquarters for booking.  (Tr. 39.)  Upon arrival, Mr. Letman's physical functions and movements appeared normal:  he got out of the patrol car by himself and was able to climb several flights of stairs "normally" without assistance.  (Tr. 40-41.)

Mr. Letman was then placed into an interview room.  (Tr. 79-80.)  As he was waiting for the interview to start, Mr. Letman was offered food and water and allowed to use the restroom.  (Tr. 90.)  The room was well-lit and it was large enough to comfortably fit a table and four chairs with room to move around.  (Tr. 80.)  The entire period during which Mr. Letman was in the room was video- and audio-recorded.  (*See* GX 8.)

Mr. Letman waited in the interrogation room for around three hours before SA Floyd and GCPD Detective J.M. Boyd entered the room to conduct the

interrogation.[6]  (GX 8, Interview_with_Eric_Letman.mp4 at 3:00:00.)  SA Floyd

read Mr. Letman his *Miranda*[7] rights and presented hm with an advice-of-rights

form, which he reviewed and signed.  (Tr. 80-82; GX 7.)  Neither SA Floyd nor

Det. Boyd threatened Mr. Letman, used trickery, or made promises to force him to

speak.  (Tr. 82, 90, 91.)  The tone of the interview was nonconfrontational.  (Tr.

90.)  Mr. Letman stated that, earlier in the morning, he had smoked "a little"

marijuana; however, he did not act intoxicated during the interview.  (Tr. 83.)

SA Floyd and Det. Boyd initially spoke with Mr. Letman for about fifteen

minutes, after which they left the room to retrieve photographs to review with him.

(GX 8, Interview_with_Eric_Letman.mp4 at 3:00:00-3:15:45.)  Three minutes

later, they returned with the photographs and continued to speak with Mr. Letman

for about another hour.  (*Id.* at 3:19:31- 4:11:50.)  During this time, they took a

break so Mr. Letman could call his wife. (Tr. 90.) Mr. Letman also asked to contact

"Miss Carol," a healthcare worker at "Viewpoint," to help "get him in the right

frame of mind to be able to help answer . . . questions" and "help him remember

---

[6] At around the 25-minute mark, Officer Fischer came in and asked Mr. Letman to write down an address he had identified.  (*See* GX 8, Interview_with_Eric_Letman.mp4 at 25:10.)  Mr. Letman complied, and wrote the address on a sheet of paper using his left hand.  (*See* GX 8, Interview_with_Eric_Letman.mp4 at 25:43.)

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

past facts." (Tr. 86).  Det. Boyd called Viewpoint, but Viewpoint advised that they were unfamiliar with Mr. Letman and that he had not been seen by Viewpoint since 2019.  (Tr. 86-87.)  Mr. Letman also disclosed that he had been diagnosed with bipolar disorder and PTSD, and that he had not taken his prescribed medications in several days.  (*Id*. at 97-98.)  He also made comments during the interview that he had "serious mental health issues" and that he had "very serious issues" for which he needed his medicine.  (GX 8, Interview_with_Eric_Letman.mp4 at 3:34, 3:48).

SA Floyd and Det. Boyd left the interview room, leaving Mr. Letman alone with photographs taken during the robberies.  (Tr. 85, 87.)  According to SA Floyd, when they left Mr. Letman alone, it did not appear that he was struggling to remember any facts, and it appeared that he was aware of what was going on.  (Tr. 100.)  In any event, Mr. Letman examined the photographs, and without any prompting, made a series of incriminating statements.  (Tr. 88-89.)

At around the four-and-a-half-hour mark, FBI Special Agent Paul Costa entered the interview room.  (GX 8, Interview_with_Eric_Letman.mp4 at 4:37:05.) He spoke with Mr. Letman for around eighteen minutes.   (GX 8, Interview_with_Eric_Letman.mp4 at 4:55:04.)  In all, Mr. Letman was in the interrogation room for about four hours and 55 minutes.  (*Id*.; *see* Tr. 96.)  Det.

Boyd and SA Floyd's questioning took about 70 minutes in total, and SA Costa's questioning took about 20 minutes more.

### D.    The Search of Mr. Letman's Chrysler 300

In the meantime, the Chrysler was towed to GCPD headquarters.  (Tr. 41.) Around 12:10 p.m., Det. Boyd obtained a search warrant for the vehicle from a Gwinnett County Magistrate Judge.  (GX 6.)  In the affidavit supporting the warrant, Det. Boyd provided the following information:

- On June 15, 2020, an unidentified black male entered a PNC Bank located at 1034 Old Peachtree Road, Lawrenceville, Georgia, carrying a fruit tray and long-stemmed roses.  He told two female employees to move to the common area of the bank, brandished a black pistol with his left hand and stated, "This is a robbery."  He then handed an employee a note that stated, "Hello I have a gun and any screams or police cumes [sic] you die first now have workers place 200.00 in counting machine first then into this bag and sit on floor."  The man also fired one shot above an employee's head.  A .22 caliber shell casing was later located by the GCPD.  The man ordered all of the employees to the vault and told them to close their eyes, before departing the bank.

10

- On August 26, 2020, an unidentified black male entered the Regions Bank located at 1985 Gravel Springs Road, Dacula, Georgia. The man was armed with a small black handgun in his left hand. He approached a teller and demanded money, but the teller did not comply. The man left the bank on foot. The man was described as an older black male, approximately 50 to 60 years old, who walked with a limp. The teller reported that the man had been in the bank two days earlier. Surveillance video from two days prior corroborated the teller's statement.

- On August 27, 2020, an unidentified black male entered a Bank OZK located at 2001 Grayson Highway, Grayson, Georgia. The man was described as an older black male, approximately 50 to 60 years old, and walked with a limp. Based on surveillance photos and the description, it appears to be the same individual from the August 26 attempted robbery at the Regions Bank on Gravel Springs Road. The man passed a note demanding money from the teller. He then wielded a small black handgun in his left hand, fired one shot into the wall behind a teller, and the teller passed an unknown amount of money. The man left the bank on foot. The teller reportedly recognized the

11

man and believed he had been in the bank the day before.  Surveillance footage from the day before showed the man entering the Bank OZK and then leaving without conducting any business.  Law enforcement believed that the man had cased both the Regions Bank and Bank OZK prior to the robberies.

- On October 26, 2020, an unidentified man entered a PNC Bank located at 1034 Old Peachtree Road, Lawrenceville, Georgia, brandishing a black handgun in his left hand.  He fired two shots into the wall near the tellers and demanded money.  The tellers complied, and he left the bank on foot.  The man was described as a black male, carrying an orange bag, and wearing a wig, half-face mask, gloves, white and black shoes with bright green accents, grey gloves, black pants, and black long sleeve shirt.  The tellers recognized the man from the prior Friday, October 23, 2020, when the man entered the bank, wearing the same wig and mask, and asked about coming back Monday, October 26, 2020 to obtain a new debit card.

- Following the October 26, 2020 robbery of the PNC Bank, the FBI and GCPD reviewed surveillance footage from the PNC Bank and other businesses in the area and observed the man with the same or

similar clothing exiting a newer model black Chrysler 300.  A witness at the PNC Bank also saw a man wearing similar or the same wig and clothing throw a duffle bag into the car and enter a vehicle described as being something like a Cadillac possibly with a Texas license plate, and possibly beginning with a seven.

- After the October 26, 2020, robbery of the PNC Bank, the FBI released photos of the getaway vehicle to the media and asked for the public's help in identifying the bank robber.

- On October 30, 2020, at approximately 8:00 a.m., GCPD received a phone call from an employee of Regions Bank (the location of the August 26 bank robbery) stating that he/she was parked in the Kroger parking lot next to the Regions Bank and observed a vehicle fitting the description of the getaway vehicle published on the news.  The vehicle made several laps in the Kroger parking lot, left the parking lot, and returned.  The vehicle then parked in a location that was positioned to easily observe the Regions Bank parking lot.

- GCPD responded to the area and observed a black Chrysler 300 parked nearby.  Officers approached the driver of the vehicle and

identified him as Eric Letman.  Mr. Letman fit the description of the bank robber previously described.

- GCPD identified that Mr. Letman had an active probation violation warrant out of DeKalb County, Georgia and was arrested.  While providing contact information and an address officer, Mr. Letman used his left hand to write on the paper, which was consistent with the bank robber, who was observed brandishing the pistol in his left hand during each of the robberies.

- All the shell casings collected from the crime scenes were found to be .22 caliber, and the shell casings from the robbery of the PNC Bank on June 15 and the Bank OZK on August 27, 2020 were examined and deemed to be fired from the same gun.

- Following Mr. Letman's arrest, GCPD impounded the Chrysler 300 driven by Mr. Letman and transferred it for processing.

[Doc. 90-1 at 3-4.]  An inventory from the search of the Chrysler is not part of the record; however, according to a subsequent warrant application to search Mr. Letman's residence, law enforcement recovered neck brace, a blue bag, a license plate, a construction vest, a black hat, a cane, a wig, a .22 caliber Taurus handgun, and several pieces of mail and paperwork.  [Doc. 90-2 at 4.]

14

E.     **The Search of Mr. Letman's Residence**

Around 2:30 p.m. on October 30, 2020, after law enforcement completed their search of the Chrysler 300, GCPD Officer R.M. Blackburn applied for and obtained a search warrant for Mr. Letman's residence at 247 Mateo Walk, Lawrenceville, Georgia. [Doc. 90-2.] Officer Blackburn's affidavit in support of the warrant application repeated much of what Det. Boyd stated in his application for the search warrant for the car, including a description of the robberies and attempted bank robberies, as well as the officers' interaction with Mr. Letman at the Exxon earlier that day. [*Id.* at 3-4.] Officer Blackburn also related that in their execution of the search warrant for the Chrysler, law enforcement found a neck brace, a blue bag, an orange construction vest, a black hat, a cane, a wig, a Texas license plate that had been reported stolen out of Lawrenceville, and a .22 caliber Taurus handgun, all in the trunk of the car. [*Id.* at 4.] Finally, Officer Blackburn wrote that several pieces of mail and paperwork with the "Mateo Walk" address were found in the car. [*Id.*]

## II.    DISCUSSION

### A.    Motion to Suppress Evidence Based on Initial Detention and Arrest

#### 1.    The Parties' Arguments

Mr. Letman moves to suppress evidence recovered from his car on the grounds that GCPD officers lacked probable cause to detain and arrest him in connection with the bank robberies.  [Doc. 94 at 11.]  In support, he contends that when officers arrived at the scene on October 30, (1) the Chrysler 300 was at an Exxon station 800 to 1,000 yards away from the Regions Bank and was not in the Kroger parking lot; (2) he was wearing shorts, a t-shirt, and flip-flops, which is not clothing that someone would wear during a robbery[8] and not the clothing that the robber wore at the prior robberies; (3) the responding officers observed no other evidence in the Chrysler linking it to the robberies—such as a gun, black clothing, or an orange bag; and (4) the car had a Georgia license plate, not a Texas plate.  [*Id.* at 12.]  Mr. Letman further argues that the DeKalb County arrest warrant did not provide a valid basis for the arrest because the officers unduly delayed the traffic stop by nearly 30 minutes "before being able to convince" DeKalb County

---

[8] Indeed, after observing Mr. Letman's clothing, Sgt. Silva quipped, "He's in flip-flops and fucking shorts," which Mr. Letman interprets as an expression that Mr. Letman was not dressed as if he were preparing to rob a bank.  (DX 1, 54V-4.mp4 at 9:50.)

16

authorities to accept him into their custody; and because Mr. Letman's continued detention after DeKalb County at first indicated they would not take him contradicted Sgt. Silva's and Officer Fischer's assurances that he would be released if DeKalb did not want to take custody of him. [*Id.* at 15-16.]

The government responds that the officers' initial encounter with Mr. Letman was a lawful consensual encounter or *Terry*[9] stop. [Doc. 98 at 12-16.] Mr. Letman's subsequent detention was lawful, the government contends, either because there was an outstanding warrant for this arrest or because the officers had probable cause to detain him while they called a drug-detection dog to investigate for marijuana. [*Id.* at 17-19.] And regarding Mr. Letman's assertion that the stop was unreasonably prolonged, the government argues that a delay of 30 minutes was not unreasonable because the officers had at least reasonable suspicion to believe that Mr. Letman was planning to commit or had previously committed bank robberies. [*Id.* at 19.] Finally, the government argues that separate from the arrest warrant, the officers had probable cause to believe that Mr. Letman had committed bank robberies based on (1) information that the bank teller reported during the 911 call that morning; (2) the similarities between Mr. Letman's car and the

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1968).

descriptions of the robber's car; (3) the fact that the Chrysler's Georgia license plate bolts that were only finger tight; (4) the similarities between Mr. Letman and the physical descriptions of the robber; (5) and the fact that both Mr. Letman and the robber appeared to be left-handed. [*Id.* at 20-22.]

On reply, Mr. Letman disputes that his encounter with law enforcement was consensual, emphasizing that there were six patrol cars at the Exxon and at least four officers "encasing" his car, which would made a reasonable person believe he was not free to leave or end the encounter. [Doc. 101 at 15.] Even so, Mr. Letman concedes that GCPD officers had reasonable suspicion to stop and investigate him based on the 911 call. [*Id.* at 15-16.] What he contends made the encounter unlawful was law enforcement's refusal to release him after DeKalb County authorities first declined to take custody of him pursuant to the open warrant, and the officers' prolonging the stop to "convince" DeKalb to accept him. [*Id.* at 16-17.] As to the government's argument about detaining him to investigate the odor of marijuana, Mr. Letman points out that Officer Fischer conceded at the evidentiary hearing that Mr. Letman was not being detained for marijuana. [*Id.* at 18.]

Finally, replying to the government's argument that GCPD had reasonable suspicion to detain Mr. Letman because the officers believed that he was planning

to commit or had committed bank robberies, Mr. Letman contends that the "weight of the evidence" indicates otherwise. [Doc. 101 at 18.] Specifically, he argues that it was unreasonable for the officers to believe that Mr. Letman was planning to rob the bank because it was closed at the time, he was not dressed for a robbery, and there was nothing visible in the Chrysler that suggested he was about to commit a robbery. [*Id.* at 18-19.]

Mr. Letman makes a similar argument in response to the government's assertion that the officers had probable cause to arrest him for bank robbery. [*Id.* at 19-21.] According to Mr. Letman, the totality of the circumstances shows that probable cause did not exist to believe that Mr. Letman was either preparing to rob the Regions Bank or that he had been involved in any of the previous robberies. [*Id.*] Among other things, Mr. Letman highlights that (1) the 911 caller reported that "this" black Chrysler 300 was involved in the prior attempted bank robbery, but also equivocated, adding that "this might not be the same guy"; (2) GCPD questioned a security guard at the bank who reported that he did not see anyone circling the bank; (3) when the police arrived on the scene, the driver of the Chrysler 300 was not looking at the bank, contrary to the 911 caller's report; (4) Mr. Letman was not wearing clothing consistent with someone about to rob a bank; (5) the wheels of Mr. Letman's car were not aftermarket; (6) Mr. Letman's car did

not have Texas plates; (7) Mr. Letman did not walk with a limp, as shown by his ability to climb several flights of stairs at GCPD unassisted; and (8) knowledge that Mr. Letman was left-handled was gained only after Mr. Letman's detention had been lengthened.  [*Id.* at 20-21.]

## 2.    Analysis

"Law enforcement officers may seize an individual for a brief, investigatory stop if they have a reasonable suspicion that (1) the individual was involved, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the initial circumstances justifying the interference."  *United States v. Ligon*, No. 21-11351, 2022 WL 2091598, at *2 (11th Cir. June 10, 2022) (citing *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012)).  "While 'reasonable suspicion' is a lower standard than probable cause, it still requires at least an objective justification."  *Id*.  "A court must examine the totality of the circumstances to determine reasonableness under the Fourth Amendment."  *Id.*

As Mr. Letman rightly concedes, GCPD officers had reasonable suspicion to approach Mr. Letman at the Exxon and detain him to investigate his link to the bank robberies.  Among other things, Mr. Letman was pumping gas into a car that matched the make, model, and color of the car identified in the BOLO; the car had the same distinctive wheels (whether "aftermarket" or not) as the one depicted in

20

the BOLO; the car matched the description of the car that the 911 caller had just identified; Mr. Letman was found near a bank that had been the target of an attempted armed robbery just two months earlier; and Mr. Letman generally matched the physical description of the robber.

The next issue is whether GCPD officers unlawfully prolonged the stop when they decided to re-contact DeKalb County about taking custody of Mr. Letman.  When the police have reasonable suspicion to make a traffic stop, "they do not have unfettered authority to detain a person indefinitely."  *United States v. Campbell*, 26 F.4th 860, 881 (11th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 95 (2022).  The "tolerable duration" of such a stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citation omitted).  Generally, this includes "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," because these checks "serve the same objective as enforcement of the traffic code:  ensuring that vehicles on the road are operated safely and responsibly."  *Id*. at 355 (internal quotation marks omitted).  "[T]asks and inquiries that are unrelated to a stop's purpose" include "measures

21

aimed at detecting criminal activity more generally" such as asking about a passenger's gang affiliation, using a dog to detect contraband, or asking the driver whether there are illegal drugs, counterfeit goods, or "dead bodies" in the car. *Campbell*, 26 F.4th at 882, 885 (internal quotation marks omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Rodriguez*, 575 U.S. at 354.

> The proper standard for addressing an unlawfully prolonged stop, then, is this:  a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes.  In other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion.

*Campbell*, 26 F.4th at 884 (citations omitted).

Applying these principles here, the portion of Mr. Letman's detention during which the officers worked to confirm his identity and check for outstanding warrants did not prolong the stop, since those tasks were well within the "mission" of the stop.  *See Rodriguez*, 575 U.S. at 354.  Thus, this portion of the encounter did not violate the Fourth Amendment.

The critical issue for purposes of the motion to suppress, however, is whether the mission of the stop ended when DeKalb County at first indicated that they would not take Mr. Letman.  Mr. Letman argues that it did because once DeKalb

County said that it did not wish to take him into custody, the purpose of the stop was completed and he should have been allowed to leave. The Court disagrees. The Court knows of no authority—and Mr. Letman points to none—that supports his proposition that GCPD officers had to accept DeKalb County's initial response and terminate the inquiry then and there. Also, DeKalb County's initial response, declining to accept custody of Mr. Letman was based on health concerns related to the pandemic and not on any circumstances unique to Mr. Letman (such as his potential connection with a string of armed bank robberies). Under these circumstances, the Court cannot agree with Mr. Letman that officers were forbidden from providing greater context to DeKalb County to explain why Mr. Letman should be taken into custody on the warrant. In other words, the mission of the traffic stop did not end because DeKalb County first responded that they did not want Mr. Letman arrested on the warrant due to pandemic-related concerns.

The next issue, then, is whether the officers were diligent in recontacting DeKalb County and confirming that they wanted to take Mr. Letman in on the outstanding warrant. The Court finds that they were. As noted, the GCPD officers were authorized as part of the stop to verify Mr. Letman's identity and determine whether he had any outstanding warrants. The officers were also entitled, under the circumstances of this case, to verify that DeKalb County wanted Mr. Letman

23

taken into custody on the outstanding probation warrant, especially given that there was at least a reasonable suspicion that he took part in armed bank robberies.  In total, Mr. Letman sat in the back of Officer Fischer's patrol car for around 26 minutes, and during this time, nothing suggests that the officers' communications with DeKalb County were delayed or prolonged for any reason unrelated to the probation warrant.  *See United States v. Simeon*, No. 2:16-CR-319-AKK-JHE-1, 2017 WL 2374097, at *4 (N.D. Ala. Mar. 26, 2017) (finding that 30-minute period during which police officers inquired whether Columbus, Georgia authorities would extradite on an outstanding warrant did not unduly prolong a traffic stop where there was no evidence that the "officers did anything to delay communications with Columbus, Georgia or prolong the stop at this point for any reason unrelated to the warrants"), *report and recommendation adopted*, 2017 WL 2351588 (N.D. Ala. May 31, 2017), *aff'd*, 752 F. App'x 822 (11th Cir. 2018).[10]

---

[10] The Court pauses to address the government's argument that there is no "rigid time limitation" on how long a *Terry* stop may last and that "courts have held that a detention of approximately 75 minutes" did not unconstitutionally prolong a stop.  [Doc. 98 at 19.]  That is generally true, but to be clear, the reasonableness of a delay depends on the mission of the stop and the diligence of the police—there is no threshold of time that is presumptively constitutional (or unconstitutional). Indeed, even a *de minimis* prolongation of a stop for 25 seconds may be unconstitutional under certain circumstances.  *See Campbell*, 26 F.4th at 885.

For these reasons, the Court finds that Mr. Letman's detention was supported by reasonable suspicion and that the mission of the stop was not unduly delayed by GCPD officers confirming that the outstanding probation violation warrant was active and that DeKalb County wanted him to be arrested on the warrant.[11]  As a result, his motion to suppress the fruits of his detention and arrest should be denied.

## B.    Motion to Suppress Statements

### 1.    Mr. Letman's Statements Were Not Fruit of the Poisonous Tree

Mr. Letman also moves to suppress the statements he made following his detention as fruit of the poisonous tree.  [Doc. 94 at 16 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).]   As just explained, however, the stop was not

---

[11] Because the Court concludes that the GCPD officers did not prolong the stop, the Court only briefly addresses the government's alternative arguments that the agents detained Mr. Letman to investigate the odor of marijuana or that the agents had probable cause to arrest him.  As to the marijuana, Officer Fischer testified that Mr. Letman was not detained on suspicion of marijuana.  (Tr. 55.) Since the mission of the stop was admitted not to investigate marijuana possession, the Court fails to see how the government can use it now to justify the detention. And as for probable cause, it bears mentioning that some of the facts that the government contends provided probable cause to arrest Mr. Letman were not known by law enforcement at the time they detained him—including, for example, that he was left-handed or even that the license plate screws were finger-tight. Ultimately, the fact that these arguments do not carry the day is of no moment because Mr. Letman's detention and arrest were not unconstitutional in light of the outstanding DeKalb warrant.

unreasonably delayed.  As a result, Mr. Letman's fruit-of-the-poisonous tree argument provides no basis for suppression.

### 2.    The Voluntariness of Mr. Letman's *Miranda* Waiver and his Post-*Miranda* Statements

On reply, Mr. Letman argues for the first time that his statements should be suppressed because he did not knowingly and voluntarily waived his *Miranda* rights.  [Doc. 101 at 26-27.]  Specifically, he argues that because he suffered from mental health issues, was in the interrogation room for about five hours, and before then, had been in the back of Officer Fischer's patrol car for about an hour, he "would not have knowingly and voluntarily given up his right to remain silent and agreed to talk to the police."  [*Id.* at 27.]  It is unclear whether Mr. Letman is challenging the *Miranda* waiver or, in a more general sense, the voluntariness of his post-waiver statements in the interrogation room.  Either way, the Court finds that the government has carried its burden to show by a preponderance of the evidence both that Mr. Letman's *Miranda* waiver and his subsequent statements were voluntary.

In *Miranda*, the Supreme Court created a presumption that statements elicited during a custodial interrogation[12] are coerced, and thus not admissible at

---

[12] The parties do not dispute that Mr. Letman was subjected to a custodial interrogation for purposes of *Miranda*.

trial, unless a suspect is first advised of certain constitutional rights: "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479. "The government has the burden of showing the knowing and intelligent nature of a waiver." *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010). This inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). Accordingly, when the government seeks to admit a defendant's inculpatory statement at trial, the government must prove by a preponderance of the evidence that, in making the statement, the defendant knowingly and voluntarily waived his *Miranda* rights. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (quotation marks omitted). The totality of all

27

the surrounding circumstances includes "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

Here, the Court finds that Mr. Letman's *Miranda* waiver was voluntarily and knowingly made. The physical setting in which the interrogation took place was not unduly coercive: the room was well-lit and large enough to comfortably fit a table and four chairs. (Tr. 80.) Within the first minute of being placed in the interview room, he was offered (and accepted) some water. (GX 8, Interview_with_Eric_Letman.mp4 at 0:00-1:00.) He was also permitted to use the restroom. (Tr. 90.) Mr. Letman's interactions with SA Floyd and Det. Boyd were cordial and professional. SA Floyd read Mr. Letman his *Miranda* rights, which Mr. Letman appeared to understand. (Tr. 80-81.) SA Floyd explicitly informed Mr. Letman that he could stop speaking any time and ask for a lawyer. (Tr. 81.) SA Floyd also presented an FBI Advice of Rights form to Mr. Letman, which he read through and signed. (Tr. 81-82; GX 7.) Mr. Letman was not threatened nor were any promises made to make him waive his rights. (Tr. 82.)

As for Mr. Letman's admission that he used marijuana earlier in the day, "intoxication is an appropriate factor that may be considered in assessing the voluntariness of a statement." *United States v. Harris*, 613 F. Supp. 2d 1290, 1301

(S.D. Ala. 2009).  But here, Letman did not appear impaired during his interactions with law enforcement, and he has not rebutted SA Floyd's testimony that he did not act intoxicated.  (Tr. 83.)  Based upon SA Floyd's undisputed testimony, then, the Court finds that the evidence preponderates against a finding that Mr. Letman was impaired.

Nor did Mr. Letman's mental health issues render his statement involuntary. Diminished mental capacity does not alone render a waiver or subsequent statements involuntary.  *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary.").  Rather, for a waiver to be found involuntary on these grounds, there must be psychological or physical coercion by an official actor (such as a law enforcement agent) who takes advantage of the defendant's mental impairment.  *Barbour*, 70 F.3d at 585; *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that coercive police activity is a necessary predicate for finding that a confession is not voluntary).  Based on this Court's review of the footage of the interrogation and the testimony of SA Floyd, the Court finds that the government has carried its burden to show that Mr. Letman's decision to waive his rights and speak was the product of a free and deliberate choice rather than intimidation, coercion, or deception and that he had a "full awareness of both the

29

nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.

The inquiry does not end here because, even if the government satisfies its burden of showing a valid *Miranda* waiver, the government must still establish that Mr. Letman's ensuing statements themselves were voluntary. *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994) ("Determining the admissibility of a postarrest confession requires a two-part inquiry. We first decide whether the law enforcement officers complied with the requirements of *Miranda v. Arizona*; if so, we then determine if the confession was voluntary.") (citations omitted); *see also United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."). The "[v]oluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver." *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).

The main thrust of Mr. Letman's challenge to the voluntariness of his statements appears to be that he had been in the back of Officer Fischer's patrol car for nearly an hour and then was in the interrogation room for almost five hours

longer.  The Court cannot agree, however, that the length of time alone rendered his statements involuntary.  As discussed, after Mr. Letman arrived at GCPD headquarters, he was taken to an interrogation room where he spent nearly three hours alone, waiting on SA Floyd to arrive.  At around the three-hour mark, SA Floyd and Det. Boyd entered the room and spoke with him for about one hour and eleven minutes.  Mr. Letman was again left alone with pictures for around twenty minutes, during which he made unprompted statements.  SA Costa then entered the room and spoke with Mr. Letman for around eighteen additional minutes.

Despite the length of time that passed, several factors show that the interrogation was not inherently coercive:  the room was comfortable and for much of the time, Mr. Letman was not handcuffed; Mr. Letman was permitted to use the restroom and given water; the interrogation took place in the middle of the day, during normal waking hours; Mr. Letman was not questioned continuously, but in two 70-minute and 20-minute blocks; and "fatigue [did] not appear to have been a factor in [his] decision to" make incriminating statements. *Martin v. Wainwright*, 770 F.2d 918, 927 (11th Cir. 1985), *opinion modified on denial of reh'g*, 781 F.2d 185 (11th Cir. 1986); *see also United States v. Augustin*, No. 06-20373-CR, 2007 WL 9653095, at *3 (S.D. Fla. Sept. 7, 2007) ("[A]n interrogation that lasts five hours is not inherently coercive, especially where, as here, Augustin was given a

31

break, offered food, water, and the use of bathroom facilities, and the interrogation occurred during 'normal waking hours.'").  Likewise, as to Mr. Letman's mental health issues, none of the agents used coercive tactics, nor did Mr. Letman exhibit signs of mental illness at any time during the interrogation.[13]  Based on this record, the Court finds that Mr. Letman's statements following his *Miranda* waiver were voluntary and should not be suppressed.

For these reasons, it is recommended that the motion to suppress statements be **DENIED**.

### C.   Motion to Suppress Evidence Seized From Mr. Letman's Car and Residence

Finally, the Court turns to Mr. Letman's motion to suppress evidence obtained during the search of his car and his residence, both of which were executed pursuant to search warrants.  [Doc. 90.]  Mr. Letman argues that the search warrants lacked probable cause and the affidavits supporting both warrants contained material misrepresentations and omissions.  [Doc. 90.]  In particular, he contends:

- neither affidavit establishes probable cause because the car did not match the description given by witnesses that the car was either a

---

[13] That is, outside of merely asserting he had a history of PTSD and bipolar disorder and explaining that he had not taken his medication recently.

Cadillac or a Camry, and because the car that was the subject of the search did not have a Texas plate beginning with the number seven, (having instead a Georgia license plate that without the number seven);

- the affidavit for the residence failed to establish probable cause because it did not provide a nexus between the residence and criminal activity;

- the affidavits misrepresented that when officers located Mr. Letman's car, it was parked in a way that provided a view of the bank parking lot, when, in fact, the car was at a gas station on the other side of a Kroger parking lot, too far from the bank to see it; and

- the affidavits did not disclose that DeKalb County advised the officers that they would not accept Mr. Letman for arrest on the outstanding warrant when contacted initially.

[*Id.* at 2, 12, 14.]  None of these arguments has merit.

Establishing probable cause "is not a high bar" and instead "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (internal quotations omitted) (cleaned up).  The task of the issuing judge is "simply to make

a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When reviewing a search warrant after the fact, the Court will uphold the determination of the issuing judge so long as he had a "substantial basis" for concluding that probable cause existed. *Id.*; *see also United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013), *overruled on other grounds by Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022).

Relying on two FBI witness interview reports relating to the PNC Bank robbery on October 26, 2020, Mr. Letman first argues that there was insufficient information linking Mr. Letman's car to bank robberies. The first report summarized an interview with a bank customer who stated that he saw the robber driving a "black car that looked like a Cadillac, but may have been something else" and that it had a Texas license plate that started with a seven. [Doc. 90-3.] In the other report, a security guard at the bank reported that the next day, he observed someone casing the same PNC bank branch and then drive away in a dark gray Camry with a spare tire on the front. [Doc. 90-4.] But these inconsistencies do not negate a finding of probable cause that the Chrysler 300 that Mr. Letman was driving likely contained evidence of armed robbery. Significantly, the witness

statements were not the only account of what car the robber used:  law enforcement obtained video surveillance that showed the robber driving a black Chrysler 300, so officers did not need to rely on the witnesses' descriptions of the car.  And as the government correctly points out, it is reasonable to believe that a criminal would swap license plates to avoid detection, such that the absence of a Texas plate would not negate a finding of probable cause.[14]  In short, the facts conveyed in the warrant application establish probable cause to believe that the Chrysler 300 was involved in the PNC Bank robbery:  it matched the color, make, and model of the two images of the car featured in the BOLO; it had the same distinctive wheels—no matter if they were aftermarket or not; the police encountered it near a bank, after reports of a similar vehicle driving suspiciously around the bank; and Mr. Letman himself matched the physical attributes of the robber.  The discrepancies identified above do not undermine these facts.

Mr. Letman's next argument—that there was no nexus between the Mateo Walk residence and alleged criminal activity—also lacks merit.  "For probable

---

[14] Indeed, the warrant application for the Chrysler disclosed that law enforcement believed that the robber's car had Texas plates, but that the Chrysler Mr. Letman was driving had a different tag.  [Doc. 90-1 at 3, 4 (describing robber's car as having a Texas license plate possibly beginning with a seven, but describing the tag on Mr. Letman's Chrysler as "PMG3215").]

cause to search a residence, there must be some nexus between the premises and the alleged criminal activity." *United States v. Schulz*, 486 F. App'x 838, 841 (11th Cir. 2012). "This does not require an allegation in the supporting affidavit that criminal activity took place at the residence, but it does require that the affidavit show a connection between the defendant and the residence and a link between the residence and the criminal activity." *Id.* "Probable cause exists to support a search of a defendant's residence where there is evidence that the defendant is in possession of contraband that is of the type that would normally be hidden at one's residence." *Id.* As to bank robberies in particular, "[c]ourts have determined that it is reasonable to infer that a bank robbery suspect would stash the proceeds of the bank robbery at a residence." *United States v. Gonzalez*, No. 1:09-CR-00371-TWT-AJB, 2010 WL 2721882, at *16 (N.D. Ga. May 25, 2010) (collecting cases), *report and recommendation adopted*, 2010 WL 2721540 (N.D. Ga. July 7, 2010).

The affidavit supporting the search warrant for the Mateo Walk residence provided sufficient information linking Mr. Letman to the address: during booking, he provided officers with the address of 247 Mateo Walk; 247 Mateo Walk was the address on his driver's license; and during the search of the Chrysler, several pieces

of mail and paper with the Mateo Walk address were located.[15]  [Doc. 90-2 at 4.]
As for the connection of the residence to criminal activity, it was reasonable for the
issuing magistrate judge to infer that evidence of the bank robberies—including
stolen funds, clothing, and ammunition—would be located at Mr. Letman's
residence.  *See Gonzalez*, 2010 WL 2721882 ,at *16.  The affidavit relayed that the
police recovered evidence from the Chrysler linking it to PNC Bank robbery,
including a wig, a stolen Texas license plate, and a .22 caliber handgun.  [Doc. 90-
2 at 4.]  No money or ammunition were recovered from the car, and these are
precisely the sorts of things that could reasonably be expected to be hidden in one's
residence.  Also, because the robber matched Mr. Letman's appearance, it was also
reasonable to believe that additional clothing worn during the robberies would be
stored there as well.

Mr. Letman's remaining arguments that the warrant affidavits contain
material omissions or misstatements and that the Court should conduct an
evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), also miss the
mark.  There is a presumption of validity with respect to an affidavit supporting a

---

[15] The affidavit also related that Mr. Letman provided an alternative address
of 670 Wayside Drive and that several pieces of mail and paperwork bearing that
address were also recovered from the Chrysler.  [Doc. 90-2 at 4.]

search warrant.  *See Franks*, 438 U.S. at 171. "To be entitled to a *Franks* hearing, a defendant must make a 'substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to a finding of probable cause.'" *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (quoting *Franks*, 438 U.S. at 155-56).  As explained by the Eleventh Circuit:

> [T]he substantiality requirement is not lightly met:  To mandate an evidentiary hearing, the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006) (citations omitted). "When a *Franks* hearing is held, a court will suppress evidence stemming from a search warrant when:  (1) the defendant shows by a preponderance of evidence that the search-warrant affidavit contains perjurious statements or statements made with a reckless disregard for the truth; and (2) the search warrant is no longer supported by probable cause after setting aside the perjurious or reckless statement." *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1367 n.31 (N.D. Ga. 2011) (citing *United*

38

*States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001)), *aff'd sub nom. United States v. Moreno*, 559 F. App'x 940 (11th Cir. 2014).

Mr. Letman argues that Det. Boyd misrepresented that the person who called 911 "saw the suspicious car parked in a way that provided a view of the bank parking lot" whereas, in actuality, when enforcement encountered Mr. Letman, he was at the gas station and not have a view of the bank. [Doc. 90 at 14.] To the contrary, Det. Boyd did not misrepresent Mr. Letman's location. The pertinent portion of the affidavits read as follows:

> On October 30, 2020, at approximately 8:00am the Gwinnett County Police Department received a phone call from an employee of Regions Bank (August 26th Bank Robbery) stating that he/she was parked in the Kroger parking lot next to the Regions Bank[], and observed a vehicle fitting the description of the getaway vehicle published on the news. The vehicle had done several laps in the Kroger parking lot, left the parking lot, and returned. The suspicious vehicle then parked in a location that was positioned to easily observe the Regions Bank parking lot.

[Doc. 90-1 at 4; Doc. 90-2 at 4.] In the next paragraph, Det. Boyd went on to explain that when officers responded to the call, they observed the Chrysler 300 parked "nearby." [Doc. 90-1 at 4; Doc. 90-2 at 4.] This shows that Det. Boyd did not even seek to describe what Mr. Letman's view was from the gas station where the police first approached him. Rather, Det. Boyd communicated what the 911 caller said *she* observed—*i.e.*, Mr. Letman's car positioned to see the bank parking

39

lot.   As a result, Mr. Letman has not shown that any of this information was incorrect, much less point to evidence that supports an inference that Det. Boyd made a false statement deliberately or in reckless disregard for the truth.

Mr. Letman's other argument—that Det. Boyd should have disclosed that DeKalb County did not want Mr. Letman to be taken into custody—fares no better because, even if that fact had been included in the affidavit, it would not have had any material effect on determining whether probable cause existed.   The initial reason that DeKalb gave for not wanting Mr. Letman arrested was concern about the pandemic—a reason unrelated to the bank robbery investigation.   And, of course, DeKalb County ultimately stated that it wanted Mr. Letman brought into custody.   Absent evidence that remotely suggests that Det. Boyd misrepresented or omitted material facts, no *Franks* hearing is necessary.[16]

---

[16] For the first time on reply, Mr. Letman identifies three more omissions that he contends defeat a finding of probable cause:  that Det. Boyd did not disclose (1) that the Chrysler did not have either a Texas license plate or a license that started with the number seven; (2) that the bank teller who called 911 was uncertain about the connection of the Chrysler 300 she observed to the crime; and (3) that when the police encountered Mr. Letman at the Exxon, he was wearing gym shorts, flip flops, and a sweatshirt and had none of the articles of clothing or accessories used by the robber, such as a gun, a wig, a face mask, or an orange handbag.  [Doc. 107 at 7-8] These omissions are not material.  To start, the affidavit for the car **twice** identified its license plate as "PMG3215" [*see* Doc. 90-1 at 3, 4], which placed the issuing judge on notice that the license plate was different than the tag the witness identified.  Thus, it is immaterial that the affidavit did not explicitly state that the Chrysler did not have a Texas license plate or that its tag number started with a

Finally, even if the affidavits supporting the Chrysler and Mateo Walk search warrants did not establish probable cause, Mr. Letman's motion to suppress should still be denied under the good-faith exception to the exclusionary rule. In *United States v. Leon*, 468 U.S. 897, 920-21 (1984), the Supreme Court recognized the good-faith exception to the exclusionary rule for searches conducted pursuant to warrants. Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the exclusionary rule should not be applied, when an officer, acting with objective good faith, has obtained a search warrant from a judge and acted within its scope. *See Leon*, 468 U.S. at 920-21. Nonetheless, the *Leon* Court noted four situations in

---

seven. Likewise, the 911 caller's uncertainty about whether the Chrysler was connected to the robberies and the information about Mr. Letman's clothing are immaterial because even if that information had been included in the affidavits, they would not have negated a finding of probable cause given all the other information presented to the issuing judge.

On reply, Mr. Letman also appears to contend that the warrant affidavits inaccurately related that "[w]hile providing contact information and an address to the reporting officer, LETMAN was observed using his left hand to write on the paper." [Doc. 90-1 at 4; Doc. 90-2 at 4; *see* Doc. 107 at 4.] He points out that the video footage from the Exxon does not show him writing anything in the presence of the officers. [Doc. 107 at 4.] Mr. Letman is correct that he did not write anything down at that time. But the video from the interrogation later that morning shows that around 25 minutes after being placed in the interview room, Mr. Letman wrote an address on a piece of paper using his left hand in the presence of Officer Fischer. (*See* GX 8, Interview_with_Eric_Letman.mp4 at 25:43.) Thus, this information was accurately related in the affidavits and provides no basis for suppression.

which the suppression of evidence would still be appropriate:  (1) when the judicial officer issues the warrant on a deliberately or recklessly false affidavit; (2) when the judicial officer wholly abandons his judicial role; (3) when the warrant is issued on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is so facially deficient that an officer could not reasonably presume it to be valid.  *Id.* at 923.

Here, there is no indication that the issuing judge abandoned his judicial role or that any officer was dishonest or reckless in preparing the affidavit.  Likewise, the affidavits supporting both affidavits were not so lacking in probable cause that it would have been objectively unreasonable to rely on them because both provided enough information to conclude that a fair probability existed that evidence of the bank robberies would be found in both locations.  *United States v. McClure*, 160 F. App'x 842, 845 (11th Cir. 2005) (finding that the *Leon* good faith exception applied when the search warrant affidavit "had more than an indicia of probable cause").  And contrary to Mr. Letman's argument, a reviewing court looks to the facts included in the affidavit—not the facts that purportedly could have or should have been included but were not—in determining whether it was objectively reasonable to rely on the search warrant.  *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003); *see also United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990)

42

(citing *Leon* for the proposition that the reviewing court examines whether, based on the totality of the circumstances, a reasonably well-trained officer would have relied on the warrant). As discussed above, the information in the affidavits support a finding of good faith reliance on the warrants. Finally, nothing on the face of either warrant was so facially deficient that an officer would not have believed it to be valid.

For all of these reasons, Mr. Letman's motion to suppress evidence seized from the Chrysler and the Mateo Walk residence should be **DENIED**.

## III.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant's motion to suppress statements [Doc. 76], motion to suppress evidence seized in connection with a traffic stop [Doc. 77], and motion to suppress searches of his car and residence [Doc. 90] be **DENIED**.

I have now addressed all pretrial matters referred to me and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO RECOMMENDED this 8th day of January, 2024.

_____
JOHN K. LARKINS III
United States Magistrate Judge

43